IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL and ALLIANCE FOR THE WILD ROCKIES,<br><br>               Plaintiffs,<br><br>vs.<br><br>JOHN MEHLHOFF and BUREAU OF LAND MANAGEMENT,<br><br>               Defendants. | CV 20-186-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

Plaintiffs filed this action seeking declaratory and injunctive relief requiring Defendants to remove grazing developments that were installed in the Iron Mask Planning Area ("Planning Area"). (Doc. 1.) Currently before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 13) and Defendants' Cross Motion for Summary Judgment (Doc. 16.) The motions are fully briefed and ripe for review. Having considered the parties' submissions, the Court recommends that Plaintiffs' motion be **GRANTED in part and DENIED in part** and Defendants' motion be **GRANTED in part and DENIED in part**, as set forth below.

/ / /

/ / /

## I.    BACKGROUND

This lawsuit follows two prior actions in this Court, in which Plaintiffs challenged vegetation and grazing decisions related to the Iron Mask Planning Area. *Native Ecosystem Council v. Judice*, 18-CV-55-BLG-SPW ("*Iron Mask I*") and *Native Ecosystems Council v. Mehlhoff*, 20-CV-19-BLG-SPW-TJC ("*Iron Mask II*").

The Iron Mask Planning Area comprises 124,933 acres in the Upper Missouri Watershed Basin near Townsend, Montana.  The BLM administers 26,235 acres within the Planning Area, consisting of 19 parcels, under a 2009 Butte Resource Management Plan ("2009 RMP").  Portions of the Planning Area are designated as an Area of Critical Environmental Concern, for which special management of fish and wildlife and other resources is given.

On July 1, 2015, the BLM produced a Final Environmental Assessment ("2015 EA") and Finding of No Significant Impacts for the Iron Mask Planning Area.  Pursuant to the 2015 EA, the BLM issued a Decision Record for Vegetation and Riparian Treatments on July 1, 2015 ("2015 Vegetation Decision"), and a Final Grazing Decision and Response to Protest for the Indian Creek Forage Reserve on March 7, 2016 ("2016 Grazing Decision").

The 2016 Grazing Decision authorized construction of fencing and water developments and established terms and conditions for grazing use.  Specifically,

the decision allowed for removal of approximately 6 miles of barbed wire fencing, construction of 5 miles of new "wildlife-friendly" fencing,[1] construction of 3 head boxes/spring developments to feed up to 7 water tanks, and installation of up to 6.5 miles of pipeline to supply the water tanks.

In March 2018, Plaintiffs filed suit in *Iron Mask I*, challenging the 2015 EA and the related 2015 Vegetation Decision and 2016 Grazing Decision.  *Iron Mask I*, 18-CV-55-BLG-SPW, Docket No. 1.  Prior to resolution of the merits of *Iron Mask I*, the BLM began implementation of portions of the 2016 Grazing Decision.  At no time during the litigation of *Iron Mask I* did Plaintiffs seek a temporary restraining order or preliminary injunction to restrain the BLM from implementing any portion of the 2016 Grazing Decision.[2]  Plaintiffs also did not request that any improvements made pursuant to the 2016 Grazing Decision be removed.  By the time the Court issued its merits ruling in *Iron Mask I*, a substantial portion of the work authorized by the 2016 Grazing Decision had been completed.  Three water

---

[1]  According to Defendants, the fencing consists of three, rather than four wires, has a smooth bottom wire, and complies with the state of Montana standards for wildlife-friendly fencing.  (Doc. 17 at n. 2.)

[2] Plaintiffs did, however, seek a preliminary injunction and temporary restraining order against implementation of "vegetation and riparian treatments" authorized under the 2015 Vegetation Decision.  *Iron Mask I*, 18-CV-55-BLG-SPW, Docket Nos. 9, 11.  Both requests were denied.  *Id.* at Docket Nos. 34, 41.

developments were constructed, approximately 6 miles of barbed wire fence was removed, and 3.25 miles of new wildlife-friendly fencing was installed.

On March 12, 2019, the Court in *Iron Mask I* ruled that the BLM had failed to take a hard look at the cumulative impacts on wildlife and special status species in the Project Area by failing to consider past, present and reasonably foreseeable vegetation projects. *Iron Mask I*, 2019 WL 1131231, *7-8 (D. Mont. March 12, 2019). The Court, therefore, remanded the matter to the BLM to prepare a supplemental EA. *Id.* at *9. The Court further enjoined Defendants from implementing the challenged actions while the proceedings required on remand were pending. *Id.* The Court did not, however, grant any relief for portions of the challenged Decisions that had already been implemented.

The BLM subsequently conducted and released the Iron Mask Supplemental EA ("2019 SEA") on September 20, 2019, and a Decision Record for Vegetative Treatments on September 23, 2019 ("2019 Vegetation Decision").

On February 28, 2020, Plaintiffs filed *Iron Mask II*, challenging the 2019 Vegetation Decision. Plaintiffs alleged the BLM failed to analyze the cumulative impacts of vegetation treatments on wildlife as required by NEPA and this Court's directive in *Iron Mask I. Iron Mask II*, 20-CV-19-BLG-SPW-TJC, Docket No. 1. Plaintiffs moved to preliminarily enjoin the 2019 Vegetation Decision. On July 6, 2020, the undersigned recommended the motion be granted as Plaintiffs had

demonstrated a likelihood of success on the merits. *Iron Mask II*, 2020 WL 3969343 (D. Mont. July 6, 2020). The Court found "the SEA has likely failed to satisfy this Court's order in *Iron Mask I* and thus NEPA's requirement that BLM give a hard look to the cumulative impacts of the proposed treatments on wildlife – with particular attention on sensitive species." *Id.* at *8. Judge Watters adopted the recommendation and preliminarily enjoined the 2019 Vegetation Decision. *Iron Mask II*, 2020 WL 4260515 (D. Mont. July 24, 2020). Following the Court's order in *Iron Mask II*, Defendants voluntarily withdrew the 2019 Vegetation Decision on August 24, 2020.

In the meantime, pursuant to the 2019 SEA, the BLM issued a grazing decision on February 28, 2020 for the Indian Creek Forage Reserve Allotment contained within the Iron Mask Planning Area ("2020 Grazing Decision"). The 2020 Grazing Decision established grazing terms and conditions, and authorized construction of "range improvement projects," including the remaining 1.5 miles of new fencing, up to 4 additional water developments, and an exclosure around a wet meadow area.

Plaintiffs administratively appealed the 2020 Grazing Decision, and on May 21, 2020, the Office of Hearings and Appeals denied Plaintiff's petition for stay. Thereafter, the BLM began implementation of the projects authorized by the 2020 Grazing Decision. The BLM installed an additional 1.5 miles of wildlife-friendly

fencing in June 2020 and completed 2 additional spring developments in September 2020.

In November 2020, Plaintiffs asked the BLM to voluntarily withdraw the 2020 Grazing Decision in light of the preliminary injunction issued in *Iron Mask II*.  The BLM agreed, and on December 10, 2020, the BLM voluntarily withdrew the "unimplemented portions" of the 2020 Grazing Decision.  In withdrawing the decision, the BLM stated, "upon completing rangeland health assessments, the BLM will complete a new NEPA analysis for this area."  (Doc. 18 at ¶ 10.)

Thereafter, Plaintiffs requested the removal of the grazing developments that the BLM had constructed pursuant to the 2016 and 2020 Grazing Decisions.  On December 17, 2020, the BLM stated that it "will not be removing any of the fencing or other range improvements installed pursuant to either the 2016 or 2020 Indian Creek Forage Reserve Allotment Grazing Decision.  Any further action by BLM, including removal of the fencing or other improvements, would require a new BLM Decision."

On December 21, 2020, Plaintiffs filed this action challenging the 2020 Grazing Decision.  Plaintiffs argue the grazing developments installed in the Iron Mask Planning Area were completed pursuant to BLM decisions that have either been found unlawful by this Court or withdrawn by the BLM.  Plaintiffs, therefore,

request the Court require the BLM to remove the fencing and stock tanks installed

in the Iron Mask Planning Area.

## II.    LEGAL STANDARD

NEPA is a procedural statute enacted to protect the environment by

requiring government agencies to meet certain procedural safeguards before taking

action affecting the environment.  *See Cal. Ex. rel. Lockyer v. US. Dept. of Agric.,*

575 F.3d 999, 1012 (9th Cir. 2009).  In other words, NEPA "force[s] agencies to

publicly consider the environmental impacts of their actions before going

forward."  *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 963 (9th Cir.

2002).

NEPA requires an agency proposing a major federal action significantly

impacting the environment to prepare an environmental impact statement ("EIS")

to analyze potential impacts and alternatives.  42 U.S.C. § 4332(C).  To determine

whether an EIS is required, the agency typically first prepares an EA.  40 C.F.R. §

1501.4(b).  An EA is a "concise public document" that "include[s] brief

discussions of the need for the proposal, of alternatives as required by [42 U.S.C. §

4332(2)(E)], of the environmental impacts of the proposed action and alternatives,

and a listing of agencies and persons consulted."  40 C.F.R. §§ 1508.9(a), (b);

*Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir.

2005).  If the EA shows no significant effect, the agency may issue a Finding of

No Significant Impact ("FONSI").  40 C.F.R. § 1501.4; *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1067 (9th Cir. 2002).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  5 U.S.C. § 706(2)(A).  Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency – not on independent fact-finding by the district court.  *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

In reviewing an agency action under the APA, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency.  *Id.*  Review is highly deferential to the agency's expertise, and presumes the agency action to be valid.  *Arkansas v.*

*Oklahoma,* 503 U.S. 91, 112 (1992).  But the agency must articulate a rational

connection between the relevant data and articulate a satisfactory explanation for

its action, including a "rational connection between the facts found and the choice

made."  *Id.*; *see also Midwater Trawlers Co-op v. Dep't of Commerce,* 282 F.3d

710, 716 (9th Cir. 2002).  Thus, the reviewing court must look at whether the

decision considered all of the relevant factors or whether the decision was a clear

error of judgment.  *Id.*

A court's review under NEPA is limited to whether the agency "took a 'hard

look' at the environmental impacts of a proposed action."  *Nat'l Parks &*

*Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir.

2010).  A "hard look" under NEPA requires consideration of all foreseeable direct

and indirect impacts.  *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957,

973 (9th Cir. 2002).  NEPA also requires a hard look at the cumulative

environmental effects or "cumulative impacts" of an action.  *Te-Moak Tribe of*

*Western Shoshone of Nevada v. U.S. Dept of Interior*, 608 F.3d 592. 603 (9th Cir.

2010).  A cumulative impact "is the impact on the environment which results from

the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions….  Cumulative impacts can result from

individually minor but collectively significant actions taking place over a period of

time."  40 C.F.R. § 1508.7.

A hard look should involve a discussion of adverse impacts that does not improperly minimize negative side effects. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005). "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Conservation Cong. v. Finely*, 774 F.3d 611, 621 (9th Cir. 2014). Once the court is "satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [its] review is at an end." *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992).

## III.   DISCUSSION

Plaintiffs argue there is no lawful decision in place authorizing the grazing developments that were installed in the Iron Mask Planning Area, because the 2016 and 2020 Grazing Decisions were tiered to the 2015 EA and subsequent 2019 SEA, which have been found unlawful. Plaintiffs further contend the implemented portions of the 2020 Grazing Decision are invalid and in violation of NEPA because of their reliance on the same cumulative effects analyses the Court found invalid in *Iron Mask II*.

Defendants counter that the Court lacks jurisdiction to decide any of Plaintiffs' claims. Defendants assert Plaintiffs' first claim is barred by res judicata because the Court already made a merits determination on the 2016 Grazing

10

Decision in *Iron Mask I*, and Plaintiffs did not request removal of grazing improvements implemented under that Decision in the prior litigation.  Defendants argue Plaintiffs' second claim is moot because the 2020 Grazing Decision has been withdrawn.  Alternatively, Defendants argue that even assuming the Court has jurisdiction, Plaintiff's claims should be denied because the 2019 SEA adequately analyzed the cumulative impacts from the implemented portions of the 2020 Grazing Decision and fulfilled the requirements of NEPA.  Finally, Defendants argue even if the BLM violated NEPA, Plaintiffs requested remedy is unwarranted because removal of the fencing and water developments would cause more harm than leaving them in place.

### A. Whether Res Judicata Bars Plaintiffs' First Claim Regarding the Grazing Developments Implemented Under the 2016 Grazing Decision

The doctrine of res judicata, or claim preclusion, provides that a final judgment on the merits precludes "a subsequent action between the same parties or their privies over the same cause of action."  *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1398 (9th Cir. 1992).  Defendants contend that to the extent Plaintiffs request removal of the fencing that was installed pursuant to the 2016 Grazing Decision, they are seeking relief for issues already resolved by the Court, and their request is therefore barred by res judicata.

Res judicata "'treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.'" *McClain v. Apodaca*, 793 F.2d 1031, 1033 (9th Cir. 1986).  The doctrine of res judicata bars not only new causes of action or legal theories, but also claims for new remedies or forms of relief.  *Id.* at 1034; Restatement (Second) of Judgments §§ 24, 25.  *See also Sidney v. Zah*, 718 F.2d 1453, 1458-59 (9th Cir. 1983) (holding that where the Hopi Tribe had an opportunity to contest a structure that had been built on Hopi land in a prior proceeding, but the Tribe failed to do so, res judicata precluded the Tribe from raising the matter in a subsequent proceeding); *Roy v. City of Augusta, Maine*, 712 F.2d 1517, 1521 (1st Cir. 1983) ("Under modern principles of res judicata, a party cannot split his claim by first seeking one type of remedy in one action and later asking for another type of relief in a second action."); *Aquino v. Cal. Reconveyance Co.*, 2014 WL 5494446, *3 (N.D. Cal. Oct. 30, 2014) (stating the plaintiff could not avoid the bar of res judicata by "seeking a different remedy for the same misconduct she previously alleged.").

Res judicata is applicable where there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between the parties." *Turtle Island Restoration Network v. U.S. Dept. of State*, 673 F.3d 914, 917 (9th Cir. 2012).  Here, the second and third factors are not in dispute.  A final judgment on the

merits was entered in *Iron Mask I* and the parties in both actions are identical. With regard to the identity of claims, the following factors are considered:

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. *Id.*

The fourth factor is "the most important." *Id.* "In most cases, 'the inquiry into the 'same transactional nucleus of facts' is essentially the same as whether the claim could have been brought in the first action.'" *Id.*

The present case involves the same grazing developments constructed under the 2016 Grazing Decision that were at issue in *Iron Mask I*. In *Iron Mask I*, Plaintiffs successfully challenged the 2016 Grazing Decision, but only sought prospective relief. Plaintiffs asked the Court to "[e]njoin implementation of the Project," *Iron Mask I*, Docket No. 1 at 27, which the Court granted, albeit after the majority of the grazing developments had been completed. Plaintiffs could have, but did not, request a temporary restraining order or preliminary injunction to halt implementation of 2016 Grazing Decision, nor did they request that any fencing or other grazing development be removed.[3]

---

[3] In Plaintiffs' response brief, they imply they were unaware that the BLM had implemented portions of the 2016 Grazing Decision before the Court's order in *Iron Mask I*. (Doc. 20 at 6.) But Plaintiffs aver that they visit the Planning Area on a regular basis. (Doc. 14-2 at ¶ 5; 14-4 at ¶3.) Indeed, Sara Jane Johnson,

Now Plaintiffs seek a new remedy – removal of the grazing developments implemented under the 2016 Grazing Decision – that was not requested in *Iron Mask I*. The Court finds Plaintiff's request for relief arises from the same transactional nucleus of facts as *Iron Mask I*. As such, there is an identity of claims. Plaintiff's request for relief, as it relates to developments constructed under the 2016 Grazing Decision, is therefore barred by res judicata.

## B.  Whether Plaintiffs' Second Claim Challenging the 2020 Grazing Decision is Moot

Federal courts lack jurisdiction to hear moot claims. *Feldman v. Bomar*, 518 F.3d 637, 642 (9th Cir. 2008). "A case is moot if events have occurred that have caused it to lose its character as a 'present, live controversy.'" *Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 591 n.1 (9th Cir. 1981). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988). Thus, in determining if an issue is moot, "the question

---

Director of Native Ecosystems Council, specifically stated that she was familiar with the locations of the new fencing and water developments, and that she had visited the Planning Area during the same time as the BLM had started work on the fencing and grazing developments. *Compare* Doc. 14-3 at ¶ 3 (stating she had been to the Planning Area on "12/1/16, 4/20/16, 10/6/17, 8/18/18, 1/26/19, and 7/16/20") with Doc. 17-1 at 8 (table showing "Fence Installed 9/2017", "Fence Installed 6/2018", "Wells Outfitted 9/2018"). As such, Plaintiffs have not shown they were unable to know about the implementation of the grazing developments prior to the Court's order in *Iron Mask I*.

is not whether the precise relief sought at the time the application for an injunction

was filed is still available.  The question is whether there can be *any* effective

relief." *Id.*  (emphasis in original).  The party asserting mootness bears the burden

of establishing there is no effective relief that can be provided.  *Forest Guardians*

*v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006).  "The burden of demonstrating

mootness is a heavy one."  *Gordon*, 849 F.2d at 1244.

Defendants assert Plaintiffs' second claim arising out of the 2020 Grazing

Decision is moot because effective relief for the claim would be to remand or

vacate the Decision and to prevent its implementation prospectively.  Defendants

contend that since all unimplemented portions of the 2020 Grazing Decision have

been withdrawn, the remaining remediable harm is speculative.  Plaintiffs counter

that effective relief is still available because the BLM has not yet provided

Plaintiffs with all of the relief they seek, namely removing the fencing and water

developments constructed pursuant to the Decision.

The Court finds that although the 2020 Grazing Decision was withdrawn,

there nevertheless remains a possibility for effective relief because impacts from

implemented portions of the Decision could ultimately be mitigated by removal or

modification of the grazing developments.  The Ninth Circuit has found live

controversies in environmental cases, even where the contested government action

has been completed.  In *Gordon*, for example, the plaintiffs challenged regulations

governing the 1986 salmon fishing season. *Gordon*, 849 F.2d at 1242. The court

determined that even though the season had concluded before the case was

decided, the case was not moot. *Id.* The court explained that "where the violation

complained of may have caused continuing harm and where the court can still act

to remedy such harm by limiting its future adverse effects, the parties clearly retain

a legally cognizable interest in the outcome." *Id.* at 1245. The Ninth Circuit,

therefore, held that the fact an alleged violation "has itself ceased is not sufficient

to render a case moot. As long as effective relief may still be available to

counteract the effects of the violation, the controversy remains live and present."

*Id. See also Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000) (finding

challenge to housing project that had already been completed was not moot

because modifications could be made to alleviate any adverse effects); *West v.

Sec'y of Dept. of Transp.*, 206 F.3d 920, 924-25 (9th Cir. 2000) (finding challenge

to the construction of a highway interchange that was already in use was not moot

because the court could order the interchange closed or taken down); *Columbia

Basin Land v. Schlesinger*, 643 F.2d 585, 591, n.1 (9th Cir. 1981) (holding an

action to enjoin the construction of power lines was not moot even though

construction was completed because the court had "the power to decide if they may

stay or if they may have to be removed").

Thus, the fact that the BLM has voluntarily withdrawn the unimplemented portion of the 2020 Grazing Decision does not moot Plaintiffs' claims with respect to the implemented portions of the Decision.  Otherwise, the BLM "could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine." *Columbia Basin*, 643 F.2d at 591 n.1.  As the Ninth Circuit observed, "[s]uch a result is not acceptable." *Id.* Because relief remains available to Plaintiffs notwithstanding the BLM's voluntary withdrawal of the unimplemented portions of the 2020 Grazing Decision, Plaintiffs' second claim is not moot.

### C.    Whether the SEA and 2020 Grazing Decision Violate NEPA

Plaintiffs argue the implemented portions of the 2020 Grazing Decision and the 2019 SEA are in violation of NEPA because the BLM failed to analyze the cumulative impacts of the 2020 Grazing Decision on all wildlife.

The Court in *Iron Mask I* found that the BLM failed to perform an adequate cumulative impact analysis in the EA, and therefore remanded the matter to BLM to prepare a supplemental environmental assessment.  *Iron Mask I*, 2019 WL 1131231, at *8-9.  In accordance with the Court's order, the BLM issued the 2019 SEA.  In *Iron Mask II*, the Court determined the 2019 SEA again failed to satisfy NEPA's requirement that the BLM give a hard look at the cumulative impacts on sensitive species in the Planning Area.  *Iron Mask II*, 2020 WL 3969343, at *3-5.

17

The SEA's cumulative impacts analysis focuses on only four big game species: elk, bighorn sheep, mule deer, and pronghorn antelope.  No analysis was conducted for several other BLM-listed sensitive species, including the gray wolf, Brewer's sparrow, golden eagle, McCown's longspur, sage thrasher, Northern leopard frog, or cutthroat trout.  *Id.* (See 2015 EA, Table 20; AR 1113-1114.)

As they did in *Iron Mask II*, Defendants again suggest that the BLM "adequately analyzed the impacts of the 2020 Grazing Decision on wildlife and special status species."  (Doc. 17 at 25.)  But as the Court previously determined, the analysis in the 2019 SEA referenced by Defendants was simply carried over from the 2009 RMP, which expressly acknowledged that it lacked necessary wildlife inventory and monitoring data.  *Iron Mask II*, 2020 WL 3969343 *3.  As a result, the BLM concluded in the 2009 RMP that "impacts cannot be quantified," and the necessary wildlife data would have to be provided in subsequent project level analyses.  *Id.*  (See AR 1604-1605.)  The actual project level "Cumulative Effects Analysis & Conclusions" in the 2019 SEA only examines the cumulative effects on the four big game species, without any analysis of other wildlife, including the special status species in the Planning Area.  (AR 304-318.)

The 2020 Grazing Decision was tiered to, and reliant on, the 2019 SEA.  Thus, the 2020 Grazing Decision relies on the same cumulative effects analysis in the 2019 SEA that the Court found deficient in *Iron Mask II*.  Plaintiffs have

submitted the declaration of wildlife biologist, Sara Jane Johnson, which describes possible adverse effects to wildlife from the fencing and water developments installed under the 2020 Grazing Decision.  Those possible effects include birds killed by fence strikes, birds drowning in stock tanks, and the risk that the water developments could adversely impact natural springs used by wildlife for water sources.  (Doc. 14-3 at 2-3; AR 698-709.)  It is thus certainly possible that the grazing developments, when added to other past and future actions, could adversely affect wildlife in the area, including BLM-listed sensitive species.  But since the 2019 SEA does not even address the issue – save for the four big game species – there is no way for the Court or the public to make that determination. Accordingly, for the same reasons the Court found the SEA inadequate in *Iron Mask II*, the Court finds the 2019 SEA and the 2020 Grazing Decision lacking here.

### D.     Whether Permanent Injunctive Relief in the Form of Removal of the Grazing Developments Implemented Under the 2020 Grazing Decision is Appropriate

As a remedy, Plaintiffs seek a permanent injunction requiring the removal of the fencing and water developments.  "An injunction is a drastic and extraordinary remedy which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)  A plaintiff seeking a permanent injunction to remedy a NEPA violation must demonstrate the following factors:

19

"(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156-57. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)). These factors apply equally in NEPA cases. Contrary to some earlier cases which indicate a lesser standard in NEPA cases, "[n]o such thumb on the scales is warranted." *Monsanto Co.*, 561 U.S. at 157.

Establishing irreparable injury should generally not be an onerous task for plaintiffs. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). This is often particularly true in environmental cases, because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). But this is not a typical environmental case. It does not involve the often cited concern that the BLM will be unable to put the trees back on stumps after a logging operation or unburn trees after a prescribed burn. The new fencing and water improvements under the 2020 Grazing Decision have already been installed.

20

The unimplemented portion of the Decision has been withdrawn; therefore, no grazing or other actions authorized by the Decision are going forward, and the water developments are not in use.  (Doc. 17-1 at ¶ 11.)  At most, Plaintiffs have shown that the grazing developments pose a possibility or potential of future harm to wildlife.  But to obtain injunctive relief a plaintiff must establish that irreparable harm is likely, not just possible.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  Plaintiffs have not demonstrated the likelihood of irreparable harm if the grazing developments are permitted to remain in place pending the BLM's completion of its cumulative impacts analysis.

Next, Plaintiffs have an adequate remedy.  While monetary damages may not be available here, Plaintiffs retain the same remedy they seek in this action.  That is, if the BLM's additional environmental analysis does not support a subsequent grazing decision, Defendants may ultimately be required to remove or modify the fencing and water developments.  If such an action is ordered, the landscape will be returned to the same condition that would exist if removal or modification was ordered now.

In analyzing the third and fourth factors – balance of hardships and public interest – "the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).  Nevertheless, a Court must still engage in a balance of harms analysis

and weigh the competing interests at state.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).  Here, the environmental harm posed by the existence of the fencing and water developments must be weighed against the hardship associated with the removal of the structures.  The Court finds that balancing the equities in this case does not favor granting injunctive relief.

With the respect to the environmental harm, the fencing and water developments have already been installed, and any environmental injury occasioned by the installation process – which has not been specified – has already occurred.  The Court recognizes there is a well-established "public interest in preserving nature and avoiding irreparable environmental injury[.]"  *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008).  But, as discussed above, there is insufficient evidence in the record to establish that the mere existence of these structures during additional environmental review will likely cause irreparable harm.  If it is ultimately determined by that review that the grazing decision cannot be sustained, the fencing and water developments can be removed at that time.

The Court also recognizes that the public possesses an interest in Defendants' compliance with NEPA's environmental review requirements and the informed decision-making that NEPA promotes.  *See e.g., Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007).  In this case,

22

however, the 2020 Grazing Decision has already been withdrawn, and grazing and use of the grazing developments will not occur in the Planning Area absent appropriate environmental review.

As to hardships associated with the removal, the structures were initially installed with public funding; they will have to be removed at public expense; and if the BLM's environmental review ultimately supports the grazing developments in the Planning Area, they will have to be reinstalled at public expense. These economic costs can properly be considered. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("Economic harm may indeed be a factor in considering the balance of equitable interests.").

Additionally, Plaintiffs' delay in seeking injunctive relief can also be considered. *Western Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (district court properly exercised its discretion weighing delay in seeking injunction until after construction began). Prior to the Court's decision in *Iron Mask I*, the BLM implemented the 2016 Grazing Decision, and had removed 6 miles of barbed wire fence, installed 3.25 miles of wildlife-friendly fencing, and constructed three water developments. At no time did Plaintiffs seek to enjoin the BLM from implementing the project. Then, after releasing the 2019 SEA and the 2020 Grazing Decision, the BLM installed an additional 1.5 miles of wildlife-friendly fencing and completed 2 more spring developments in 2020. Again,

23

Plaintiffs did not seek to enjoin the installation of these developments. Instead, Plaintiffs waited approximately four years after the remediation and construction began, and after the grazing developments were near completion.

It is also appears clear that the current situation is safer for wildlife than returning the area to its pre-implementation condition. As the situation now stands, 6 miles of the more hazardous barbed wire fencing has been removed and replaced with 4.75 miles of wildlife-friendly fencing. None of the water developments appear to be in use, thus alleviating plaintiffs' concern that they present a drowning risk for birds. In short, implementation of the project appears to have been an improvement for wildlife safety over what existed previously, and what would exist if the BLM returned the Planning Area to its original condition.

The Ninth Circuit has considered an appropriate remedy in a situation where, as here, a project has been completed without proper NEPA analysis. In *West v. Secretary Dept. of Transp.* 206 F.3d 920 (2000), for example, the plaintiff challenged the Federal Highway Administration's decision to categorically exclude a highway interchange project from review under NEPA. "Stage 1" of the project had already been completed, and the interchange was fully operational and open to traffic. The Ninth Circuit ultimately determined that use of the exclusion was not appropriate and an environmental assessment was required.

In considering an appropriate remedy, the Ninth Circuit said that its "remedial powers would include remanding for additional environmental review and, conceivable, ordering the interchange closed or taken down." *Id.* at 925. The Court recognized, however, that there were "likely other available remedial measures short of tearing the interchange down." *Id.* at 929. The Court, therefore, declined to order removal of the interchange, and instead remanded to the district court to order the requisite environmental review. *Id.* at 930.

This Court similarly remanded a matter to the United States Forest Service (USFS) without requiring removal of several permanent structures unlawfully constructed along the banks of the Salmon River in *Wilderness Watch v. U.S. Forest Service*, 143 F.Supp.2d 1186 (D. Mont. 2000)  There, the Court determined that special use permits issued by the USFS for construction of the structures violated the Wild and Scenic Rivers Act, and the final environmental impact statement prepared for the issuance of the permits was inadequate under NEPA. Plaintiff sought injunctive relief, requiring the removal of the structures. *Id.* at 1210. But the Court declined, noting that an injunction "will not automatically issue" once the Court finds the USFS violated environmental laws. *Id.* Instead, the Court remanded the case to the USFS, with instructions to "fashion a remedy consistent with [the Court's] opinion." *Id.*

25

Plaintiffs are correct that the cumulative impacts analysis in the 2019 SEA is deficient and this deficiency must be remedied.  But the Court finds that application of the *Monsanto* factors does not compel injunctive relief. Accordingly, in line with the course taken *West* and *Wilderness Watch*, the Court finds that remand to the BLM, without ordering the removal of grazing developments, is appropriate in this case.  On remand, the BLM should be ordered to complete its NEPA analysis, which shall include an analysis of the cumulative effects of its grazing decision on all wildlife in the Planning Area.

## IV.    CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that:

1.    Plaintiffs' Motion for Summary Judgment (Doc. 13) be **GRANTED in part and DENIED in part**;

2.    Defendants' Cross Motion for Summary Judgement (Doc. 16.) be **GRANTED in part and DENIED in part**; and

3.    This case should be remanded to the BLM to complete its NEPA analysis in the Planning Area, which shall include an analysis of the cumulative effects of its grazing decision on all wildlife in the Planning Area.  The BLM's analysis should be completed within 180 days.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the

26

parties.  The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court, and copies served on opposing counsel, within fourteen (14) days after entry hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 7th day of February, 2022.

TIMOTHY J. CAVAN
United States Magistrate Judge